## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
### Division West Palm Beach

In re:

**SERVE-EM.COM**
       **Debtor,**

**ROBERT A. GIBSON**
       **Debtor,**

**CASE NO. 03-32460-PGH**

**CASE NO. 05-36640-SHF**

---

**WOODIE H. THOMAS, III, P.A.**

           **Plaintiff,**

**v.**

**ROBERT A. GIBSON, Individually, DONALD GIBSON, Individually, SERVE-EM, INCORPORATED, a Florida Corporation, SERVE-EM.COM, Inc., a Florida Corporation, 1-800-SERVE-EM.COM, INC., a Florida Corporation, BIKE-TAXI COPORATION, a Florida Corporation, CORBLET CORPORATION, a Florida Corporation, CORBADEX CORPORATION, a Florida Corporation, JURIFUND CORPORATION, a Florida Corporation, AIRPORT PROCESS, INC., a Florida Corporation,**

           **Defendants.**

**Adversary Proceeding No. 08-01209-PGH**

**Motion for Re-Hearing or in the Alternative, Modify the Judgment/ Order to Comport with Ruling Enunciated in Open Court.**

---/

**COMES NOW** Debtor/Defendant Robert A. Gibson and files this motion for re-hearing or in the alternative, to modify the Judgment/Order to comport with the ruling enunciated in open Court, and states as follows:

1.      On April 21, 2008 a hearing was held before this court upon Defendant/Debtor, Robert A. Gibson's Amended Notice of Removal and Plaintiff, Woodie H. Thomas III, P.A.'s Motion to Strike.

2.      Defendant/Debtor, Robert A. Gibson's Amended Notice of Removal contained a prayer that appropriate sanctions be levied on Woodie H. Thomas, III P.A. for willful and capricious violation of the Federal Bankruptcy Rules.

3.      The Court remanded the case back to the state court thereby relinquishing jurisdiction, with the proviso that pursuit of all claims against Serve-em or the consolidated entities, and/or Robert Gibson are permanently enjoined. (April 21, 2008 transcript page 19 line 7 *attached*).

4.      Subsequently, the Court filed an order that included a line in which "Robert Gibson's request for sanctions against Thomas is **DENIED**" (ORDERED in the Southern district of Florida on April 23, 2008 - page 3 *attached*).

5.      This modified order was issued subsequent to the abdication of jurisdiction.

6.      Title 11 §362 automatic stay violations give rise to a private cause of action inuring to the Debtor for cases filed before October 18th 2005 under pre-act 11 U.S.C. § 362(h): "An *individual* injured by any willful violation of a stay provided by this section *shall recover* actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages". (Emphasis added).

7.     Title 11 §105 contempt sanctions are provided for §524 permanent injunction violations.

8.     United States Southern District Bankruptcy Court acknowledges and upholds this "fresh start" right of the Debtor (345 B.R. 773 *attached*).

9.     This court's post script ruling denying Defendant/Debtor Robert A. Gibson sanctions, if passing jurisdictional scrutiny would give Plaintiff, Woodie H. Thomas III and his firm an undeserved *res judicata* defense.

10.     Defendant/Debtor Robert A. Gibson was not accorded an opportunity to provide evidence or argue the equities of awarding sanctions under §362 and/or §105/524.

11.     Defendant/Debtor Robert A. Gibson is entitled to reopen his bankruptcy and pursue these actions.


WHEREFORE, for the foregoing reasons Debtor/Defendant Robert A. Gibson respectfully request a trial on the merits, or in the alternative to modify the Judgment/Order removing the line denying Defendant/ Debtor Robert A. Gibson's "request for sanctions" thereby preserving Defendant/Debtor Robert A. Gibson's right to reopen his case and pursue the appropriate actions.


Respectfully submitted this 6th day of May, 2008.

Robert A. Gibson

CERTIFICATE OF SERVICE

UNDER PENALTY OF PERJURY, I CERTIFY that a copy of the foregoing was provided by regular U.S. mail to the following this 6th day of May, 2008.

Woodie H. Thomas, III Ph.D.
Woodie H. Thomas, III, P.A.
1603 Vision Drive,
Palm Beach Gardens, Florida 33410

Richard Glenn
Attorney for Airport Process, Inc.
11382 Prosperity Farms Rd. Ste F-222
Palm beach Gardens, FL 33410

Michael R. Bakst, Trustee and
Attorney for all other Corporate
Defendants
222 Lakeview Ave. Suite #1330
West Palm Beach, FL 33401

Don Gibson
2301 Bay drive
Pompano Beach, FL 33062

STATE OF FLORIDA
COUNTY OF PALM BEACH

Robert A. Gibson
P.O. Box 6786
West Palm Beach, FL 33405-6786
Phone: 561.404.5701

BEFORE ME personally appeared Robert Gibson who being by me first duly sworn and identified in accordance with Florida law, did execute the entire foregoing in my presence.



Notary Public

PATRICIA BARRON
MY COMMISSION # DD723505
EXPIRES October 09, 2011
(407) 398-0153    FloridaNotaryService.com

1              UNITED STATES BANKRUPTCY COURT
               SOUTHERN DISTRICT OF FLORIDA
2

3                  Judge Paul G. Hyman, Jr.

4

5     In Re:

6                              Case No. 03-32460-BKC-PGH

7     SERVE-EM.COM
            Debtor.
8     _____

9     WOODIE H. THOMAS, III, P.A.,
            Plaintiff,
10
      vs.                      Case No. 08-01209-BKC-PGH-A
11
      ROBERT A. GIBSON,
12          Defendant.
      _____
13
      AMENDED NOTICE OF REMOVAL FILED BY ROBERT GIBSON (2)
14    MOTION TO STRIKE AMENDED NOTICE OF REMOVAL FILED BY
      WOODIE H. THOMAS, III, P.A. (4)
15

16                        April 21, 2008

17

18
      The above entitled cause came on for hearing before the
19    HONORABLE PAUL G. HYMAN, JR., the Chief Judge in the
      UNITED STATES BANKRUPTCY COURT, in and for the SOUTHERN
20    DISTRICT OF FLORIDA, at 1515 North Flagler Drive, West
      Palm Beach, Palm Beach County, Florida, on April 21,
21    2008, commencing on or about 10:30 a.m., and the
      following proceedings were had:
22

23

24      Reported By:  Jacquelyn Ann Jones, Court Reporter

25              OUELLETTE & MAULDIN COURT REPORTERS
                      (305) 358-8875

1

1
    APPEARANCES:
2

3    MR. ROBERT GIBSON, PRO SE
    On behalf of the Defendants
4

5    WOODIE H. THOMAS, III, P.A.
    By:  WOODIE H. THOMAS, III, ESQUIRE
6    On behalf of the Plaintiff

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  Thomas versus Gibson.  Why don't you all tell me who you all are.

2    MR. THOMAS:  I'm Attorney Woodie Thomas, Your

3    Honor.

4    MR. GIBSON:  I'm Robert Gibson.

5    THE COURT:  Okay.

6    MR. GIBSON:  The defendant in this case.

7    THE COURT:  Okay.  Tell me what's going on.

8    Frankly, I don't understand it.

9    MR. THOMAS:  Well, at the time --

10    MR. GIBSON:  Your Honor.

11    THE COURT:  Yes, sir.

12    MR. GIBSON:  Before we proceed, I have a motion

13    in to disqualify Mr. Thomas as attorney for the

14    corporation.

15    THE COURT:  He's a party here, isn't he?

16    MR. GIBSON:  No, he's not a party, Your

17    Honor.

18    THE COURT:  Why is it not -- he's listed as a

19    party.

20    MR. GIBSON:  No.  His firm is listed as a

21    party.  He's not a party himself.

22    THE COURT:  Okay.  Well, I'm going to hear

23    what's going on first, and then I'll deal with that.

24    MR. GIBSON:  Thank you, Your Honor.

25    MR. THOMAS:  At one time I represented Mr.

1    Gibson, and I've sued him for attorney fees in County

2    Court.  And all of these defendants were served.  Mr.

3    Gibson came into court at a hearing, and then there was a

4    subsequent hearing, and he was protesting that he was

5    served the day before he was officially discharged as an

6    individual debtor in this bankruptcy proceeding.

7              THE COURT:  What does this have to do with

8    Serve-em?

9              MR. THOMAS:  Well, I'm not interested in

10   Serve-em, I'm only trying to get remanded back to the

11   County Court.  Robert Gibson and Donald Gibson --

12             THE COURT:  Why is it referenced to Serve-em?

13   What is the relationship between this and Serve-em?

14             MR. THOMAS:  Well, all these corporations were

15   owned by Mr. Gibson at one time.

16             THE COURT:  Okay.  Is Serve-em a defendant over

17   there?

18             MR. THOMAS:  No.

19             THE COURT:  Okay.  Mr. -- okay.  So you're

20   trying to proceed with a judgment against Mr. Gibson.

21             MR. THOMAS:  Mr. Robert Gibson, Don Gibson, and

22   Airport Process, Inc., which are not subject -- they're

23   not parties in any bankruptcy.

24             THE COURT:  Mr. Robert Gibson is a party?

25             MR. THOMAS:  He was discharged.

4

1          THE COURT:  Okay.  Is your claim a pre-petition

2     claim?  Did it arise prior to the bankruptcy of

3     Mr. Robert Gibson?

4          MR. THOMAS:  Yes.

5          THE COURT:  Then how do you have the right to

6     sue him in State Court on a pre-petition claim?

7          MR. THOMAS:  I'm not a creditor or party in

8     that other -- he didn't -- never listed me as a

9     creditor.

10          THE COURT:  So?

11          MR. THOMAS:  Well, it's my understanding if he

12     listed me as a creditor then --

13          THE COURT:  Your understanding is wrong.

14          MR. THOMAS:  Oh.  Well, I got no notice from

15     the Bankruptcy Count.

16          THE COURT:  And your rights and remedy is to

17     come back into Bankruptcy Court to seek -- you know, to

18     file a claim here, to seek -- if you have grounds to

19     object to his discharge, seek a revocation of his

20     discharge, things like that, but not to pursue the claim

21     against him.  If yours is a pre-petition claim, then you

22     have no right to pursue a debtor in bankruptcy, even if

23     you weren't listed.

24          MR. THOMAS:  Okay.

25          THE COURT:  It doesn't mean you're deprived of

1    rights.  You in essence, need to come back in and seek an

2    unwinding, but I don't know if you have grounds to object

3    to his discharge or not.  If it's just a pre-petition

4    unsecured claim, probably not.

5              MR. THOMAS:  Okay.  How about Don Gibson and

6    Airport Process, Inc.?

7              THE COURT:  Are they debtors in bankruptcy?

8              MR. THOMAS:  Not to my knowledge.

9              THE COURT:  Are they debtors in bankruptcy, Mr.

10   Gibson?

11             MR. GIBSON:  Your Honor, Don Gibson's only

12   exposure to this whole case is, he was the successful

13   bidder at a bankruptcy sale of the assets free and clear

14   of all liens and encumbrances of the -- in the

15   Serve-em.com case.

16             THE COURT:  So he's not a debtor in bankruptcy.

17   How about that corporation?  What was the corporation?

18             MR. THOMAS:  Airport Process, Inc.

19             THE COURT:  Airport Process, Inc., was that a

20   debtor in bankruptcy?

21             MR. GIBSON:  Airport Process, Inc. was the

22   company that proceeded with the bankrupt company as a

23   result of the bankruptcy sale.

24             THE COURT:  Okay.  Are you seeking to pierce

25   the corporate veil or determine these entities are alter

1    egos of Mr. Robert Gibson?

2            MR. THOMAS:  I don't think that was in my

3    complaint.  I think it's just against Airport Process,

4    Inc. and Don Gibson at this point.

5            THE COURT:  And that claim is independent

6    completely of any claim you may have against Robert

7    Gibson?

8            MR. THOMAS:  It is now, since you're not going

9    to remand Mr. Gibson back.

10           THE COURT:  Well, that's what the law is.  The

11    law is, he's in bankruptcy, yours is a pre-petition

12    claim, the automatic stay stays you from proceeding, and

13    the claims that you may or may not have against, what's

14    his name, John Gibson?

15           MR. GIBSON:  Don Gibson.

16           THE COURT:  Don Gibson or this Airport Service

17    or --

18           MR. GIBSON:  Airport Process, Inc.

19           THE COURT:  Airport Process, Inc., the State

20    Court has to determine that issue like any other claims.

21           MR. GIBSON:  Your Honor, I submit that that,

22    and we'll provide a brief, that that is part of the

23    Serve-em.com bankruptcy, because the only exposure to Mr.

24    Thomas with regard to the allegations and claims he's

25    making in his claims, are not against me, they're against

1    the corporation.  He's alleging that I'm the

2    corporation.

3              THE COURT:  Which corporation?

4              MR. GIBSON:  Well, his claim is actually

5    against Corblett Corporation, which is a corporation

6    that was consolidated in the Serve-em.com case, and was

7    sold, and the assets were sold to my father, Don Gibson,

8    at a bankruptcy sale.  And that is an issue that more

9    appropriately should be decided in the Bankruptcy

10   Court.

11             THE COURT:  Well, sir, I can only tell you

12   this, and that is, if he has an independent claim against

13   your father, Don Gibson, or any other company that is not

14   in bankruptcy, then this Court has no jurisdiction over

15   him.

16             Even if, for example, if he represented a

17   creditor in bankruptcy, not the debtor, and sued that

18   creditor in bankruptcy, the creditor of, let's say in

19   your case, I would have no jurisdiction of that claim

20   between him and that creditor, even though the claim

21   arose in essence, from his representation of that

22   creditor in your bankruptcy.  That's not stayed.

23             MR. GIBSON:  I understand.  I would say that my

24   situation is distinguished from that in the following

25   way.

8

1          THE COURT:  Well, wait.  You don't represent

2     them.  I'm going to stay him from pursuing any claim he

3     has against you or Serve-em, because they're in

4     bankruptcy.  Okay.  So he can't pursue claims against you

5     or Serve-em, because they're in bankruptcy, there's an

6     automatic stay, and that's my ruling.

7          Okay.  So your situation is taken care of.

8          MR. GIBSON:  I appreciate it.  But I'm also the

9     largest shareholder and the president of Airport

10    Process.

11         THE COURT:  Well, Airport Process needs to,

12    again, under my analogy, unless Airport Process was an

13    asset of your estate, your bankruptcy estate, which means

14    it would have been administered in your bankruptcy

15    estate, this Court has no jurisdiction over it.  If he's

16    got an independent claim against Airport Process, the

17    State Court decides that issue.

18         Now, his claim may be totally meritless against

19    Airport Process or Don Gibson, but that's not -- I don't

20    have jurisdiction to determine those issues.  That's

21    something the State Court has to decide.

22         MR. GIBSON:  May I argue that point for a

23    moment?

24         THE COURT:  Sure.

25         MR. GIBSON:  My position is that the Bankruptcy

1   Court has jurisdiction in this case, because Mr. Thomas

2   is, or would be, if allowed to continue in State Court,

3   violating the order of the Bankruptcy Court in which the

4   assets, and the assets that -- the claims made by Mr.

5   Thomas are against the assets that were sold at a

6   bankruptcy sale free and clear of all liens and

7   encumbrances.  And as Mr. Thomas has stated, nothing

8   he is pursuing is post -- post bankruptcy filing.

9           So therefore, anybody pursuing the assets,

10  granted free and clear of all liens and encumbrances,

11  ought to appropriately be decided in Federal Court, as

12  opposed to State Court, because they don't have the

13  knowledge to hear that issue, because it's a delicate

14  bankruptcy -- I found out the State Court judges don't

15  know much about bankruptcy issues at all.

16          THE COURT:  Tell me what you're talking

17  about.

18          MR. GIBSON:  Don Gibson, my father, who is

19  behind me today, was successful bidder at a bankruptcy

20  sale for Serve-em.com.

21          THE COURT:  What date?  Just tell me the date.

22          MR. GIBSON:  May I approach?

23          THE COURT:  No.  You can tell me the date.  You

24  can answer my questions.

25          MR. GIBSON:  The order was on March 2, 2005.

1          THE COURT:  Then I do need to see the order,

2     because it won't be on line.  Everything prior to October

3     of 2005 is on line.  Well, this is a bill of sale.  You

4     said there was an order.

5          MR. GIBSON:  Behind it is the order.

6          THE COURT:  What is the nature of your claim

7     against Airport Process?

8          MR. THOMAS:  For attorney's fees.

9          THE COURT:  And what -- tell me what you mean

10    by that.  Did you represent Airport Process?

11         MR. THOMAS:  Airport Process wasn't formalized

12    as a corporation until after all the proceedings.  My

13    claim is for quantum meruit.  Airport Process was a

14    concept floating around that, once all this was settled,

15    it was our objective to form a corporation called Airport

16    Process, Inc.

17         THE COURT:  When you say our concept, what do

18    you mean?

19         MR. THOMAS:  Well, I mean when I worked with

20    Mr. Gibson to --

21         THE COURT:  Don Gibson or Robert Gibson?

22         MR. THOMAS:  Well, both of them.  Don Gibson

23    and Robert Gibson.

24         THE COURT:  Okay.  Now you did work for Airport

25    Process?

11

1          MR. THOMAS:  Well, I represented Don Gibson as

2     an attorney during this process.  And Mr. Gibson came to

3     me, he wanted to clean up all these bankruptcy issues and

4     several other lawsuits, and I met with his father early

5     on and they were trying to protect some investment money

6     that they had put into one of these corporations.  And

7     so --

8          THE COURT:  I asked a simple question.  Did you

9     represent Airport Process?

10         MR. THOMAS:  I didn't represent --

11         THE COURT:  I'm trying to figure out the nature

12    of your claim against Airport Process.  Did you represent

13    them, or Don Gibson?

14         MR. THOMAS:  Well, I represented Don Gibson.

15         THE COURT:  Do you have a letter of retention?

16         MR. THOMAS:  No.

17         THE COURT:  Why not?

18         MR. THOMAS:  It just -- I just --

19         THE COURT:  Did you represent Airport Process?

20         MR. THOMAS:  Well, I didn't represent them as

21    Airport Process, Inc. as such, because that was formed

22    after this bankruptcy proceedings were being cleared up

23    to try to incorporate everything into one corporation.

24         THE COURT:  So you billed Mr. Don Gibson?

25         MR. THOMAS:  No.  I billed Robert Gibson, but I

1    had Mr. Don Gibson's consent to represent him to try

2    to --

3                THE COURT:  Him being who?

4                MR. THOMAS:  Pardon?

5                THE COURT:  You said you had Don Gibson's

6    consent to represent him.  Do you mean Mr. Don Gibson?

7                MR. THOMAS:  Him individually, yes.

8                THE COURT:  Mr. Don Gibson?

9                MR. THOMAS:  Yes.

10               THE COURT:  Okay.  Is that in writing?

11               MR. THOMAS:  Well, there's a complaint with his

12   name on it, and my testimony is in an affidavit that I

13   met with Mr. Gibson early on for lunch with his wife

14   and -- see, I had previously had an adversary

15   relationship with Mr. Gibson in another case.

16               THE COURT:  Which Mr. Gibson?  There's two of

17   them.

18               MR. THOMAS:  Well, it was against Robert.

19               THE COURT:  Okay.  So you sued Mr. Robert

20   Gibson?

21               MR. THOMAS:  Right.

22               THE COURT:  On behalf of yourself or someone

23   else?

24               MR. THOMAS:  Someone else.

25               THE COURT:  So you represented someone else

1    against Robert Gibson?

2             MR. THOMAS:  Yes.  And he appreciated my

3    litigation skills, so -- this was back in, I think '94,

4    '96 something like that.

5             And he called me and said he was in trouble and

6    asked me if I could help him end all these situations and

7    move forward.

8             THE COURT:  Okay.  Well, any claim against

9    Robert Gibson is stayed.

10            MR. THOMAS:  Yes.

11            THE COURT:  And as it sits today, discharged.

12   So tell me -- let's go back to Don Gibson, or Airport

13   Process.

14            MR. THOMAS:  Don Gibson agreed for me to

15   represent him and his interests with Robert Gibson in

16   another case, several cases.

17            THE COURT:  Is your claim more than $500?

18            MR. THOMAS:  Yes.

19            THE COURT:  How do you get around the statute

20   of frauds?  You don't have anything in writing.

21            MR. THOMAS:  Well, I have billing statements

22   and receipts, and I can establish quantum meruit.

23            THE COURT:  As to Mr. Don Gibson.

24            MR. THOMAS:  Well, I believe I have sufficient

25   evidence to demonstrate that Mr. Don Gibson approved the


                              14

1    process, and the goal was to formulate Airport Process,

2    Inc. after all this was done.  We didn't want that name

3    out there until this process was done.  It was informally

4    referred to as Airport Process.

5            Mr. Gibson was trying to formulate a Federal

6    Express concept out of Manchester, New Hampshire, called

7    Airport Process, much liked -- to do service of process

8    nationally and internationally, was its concept.

9            MR. GIBSON:  Your Honor, if I may, is counsel

10   giving testimony today?

11           THE COURT:  No.  Just hold on.

12           Well, the order that you handed me, dated March

13   9th, 2005, is an order in the Serve-em.com, Inc. case,

14   where Don Gibson purchased all of the assets of the

15   debtor for $40,000, free and clear of any claims, liens,

16   encumbrances of Serve-em.

17           MR. GIBSON:  Your Honor, the other companies

18   that he mentioned were consolidated in that case.  I'd

19   have to go through the record --

20           THE COURT:  Airport Process was?

21           MR. GIBSON:  Airport Process was not, no,

22   Your Honor.  But there was no claim against Airport

23   Process.  His claims, as he said, all predate the

24   formation of Airport Process.

25           THE COURT:  And he says he has independent

1   claims against Don Gibson and Airport Process.

2           MR. GIBSON:  After that date of -- because the

3   companies were not formed until after that date.

4           THE COURT:  I understand.  So tell me why this

5   Court has jurisdiction over an independent claim against

6   non-debtor entities.

7           MR. GIBSON:  Because the claim against the

8   non-debtor entities is only -- can only be through the

9   assets that were purchased by Don Gibson, and those are

10  free and clear of all liens and encumbrances.  He has not

11  any independent claim against Don Gibson or Airport

12  Process, so --

13          THE COURT:  It's only free and clear of claims

14  of Serve-em.

15          MR. GIBSON:  And the other companies.

16          THE COURT:  And the other companies.  I

17  don't -- when you say other companies, Serve-em.Com is

18  the debtor.

19          MR. GIBSON:  But there were five other

20  companies which were consolidated in that case, and they

21  were included in that order.

22          And one of the companies is Corblett

23  Corporation, which is the company -- I'm sorry, Corbadex

24  Corporation, which is the company that Mr. Thomas

25  invoiced.  It's the only entity he's ever invoiced.  He

16

1   never invoiced me, he never invoiced my father.  He only

2   invoiced Corbadex.

3            By the way, we dispute that invoice.  That

4   invoice was completely fabricated after the fact.

5            However, even if we accept, for argument's sake

6   that that invoice is valid, he only invoiced Corbadex.

7   Corbadex assets were sold free and clear of all liens and

8   encumbrances, and he can't go after Corbadex, and he

9   can't go after the buyer, the successful buyer of the

10  assets of Corbadex for pre-petition claims against

11  Corbadex, which is what he's doing.

12           THE COURT:  If he's pursuing a pre-petition

13  claim against Serve-em or any other consolidated

14  entities, that is State.

15           MR. GIBSON:  That's what he's claiming.

16           THE COURT:  No, he's not.  That's not what he's

17  told me.

18           MR. GIBSON:  Well, he's lying.

19           THE COURT:  Well, then raise that in State

20  Court.  It's just like any other bogus claim that someone

21  brings in State Court.  If he lies, then he's subject to

22  Bar and State Court disciplinary.  I have no jurisdiction

23  over these other -- these non-debtor entities.

24           MR. GIBSON:  Your Honor, over a year and a half

25  ago I filed motions -- I mean notices of -- I'm sorry.

1    Suggestion of bankruptcies, advising the Court.  The

2    Court had a finding that everything was stayed.

3         THE COURT:  Which court?

4         MR. GIBSON:  The State Court had a finding that

5    everything was stayed.  Mr. Thomas proceeding again with

6    another judge in the same case, completely ignoring the

7    finding of the Court.  So at this point the only option

8    we had was --

9         THE COURT:  Then file a notice of bankruptcy in

10    that court.

11         MR. GIBSON:  No, it's the same case.  It's been

12    filed, it's a different judge.  And what happens is, it

13    sits there for months and months, and then suddenly he

14    brings it alive again, sets it up for mediation, without

15    noticing parties, just sets it for mediation.  I find out

16    we've got a mediation and atrial, and that's what came

17    through moving this through Federal Court because this is

18    the only place this can properly be resolved.

19         MR. THOMAS:  I'm going to object, Your Honor,

20    All that is false testimony.

21         THE COURT:  Well, having said that, that's not

22    the only place this can be resolved.  It should be

23    resolved, since this is independent claims of any debtor

24    here, in State Court.  If the State Court judges can't

25    figure out that this is a bogus claim, as you asserted,

```
 1    then that's -- your complaint is with them.  It is not my
 2    role to substitute myself for a State Court claim
 3    against -- that is not related to this case.
 4              MR. GIBSON:  But my argument is that the
 5    auction, the sale, and the order strips State Court of
 6    jurisdiction --
 7              THE COURT:  Okay.  Well, I've ruled.  This is
 8    what I'm going to do.  I'm going to deny your motion to
 9    remove -- remand it back to State Court, with the proviso
10    that all claims against Serve-em or the consolidated
11    entities, and/or Robert Gibson are stayed.
12              MR. GIBSON:  Stayed or enjoined?
13              THE COURT:  Stayed.
14              MR. GIBSON:  524, Your Honor.
15              THE COURT:  What do you mean?  What is the
16    difference --
17              MR. GIBSON:  Well, it's permanently enjoined,
18    as opposed to 326, where it's temporarily stayed.
19              THE COURT:  Well, it's not temporarily
20    stayed.
21              MR. GIBSON:  Well, then it would be a permanent
22    injunction under Rule 524.
23              THE COURT:  It's not rule, it's code section.
24              MR. GIBSON:  I'm sorry.
25              THE COURT:  Well, he's enjoined from pursuing
```

1    any claims against those entities.

2            MR. GIBSON:  And that would be permanently.

3            THE COURT:  Absent further order of the

4    court.

5            MR. GIBSON:  Okay.

6            THE COURT:  And then if the State Court can't

7    figure this out, I can't help you, because that's an

8    independent claim.  But the State Court should be able to

9    figure this out, if this is, as you say, a totally bogus

10   claim against non-debtor entities, that's the State

11   Court's role.  Just like you could go out and sue Joe

12   Blow on a bogus claim.  I have no jurisdiction to deal

13   with it.  Okay.

14           So we'll prepare the appropriate order.

15           MR. GIBSON:  Thank you, Your Honor.

16           As a question of procedure, what's the

17   procedure for getting a transcript of this?

18           THE COURT:  Just check with her.

19           MR. GIBSON:  May I get a card.

20           THE COURT:  Yes, sir.  Yes, you want your

21   papers.  I'm sorry.

22           MR. GIBSON:  Thank you, Your Honor.

23               (The proceedings were concluded.)

24

25

```
1                           C E R T I F I C A T E

2

3    The State of Florida        )

4    County of Palm Beach        )

5

6              I, JACQUELYN ANN JONES, Court Reporter, certify

7    that I was authorized to and did stenographically report

8    the foregoing hearing; and that the transcript is a true

9    record of my stenographic notes.

10             I further certify that I am not a relative,

11   employee, attorney or counsel of any of the parties, nor

12   am I a relative or employee of any of the parties'

13   attorney or counsel connected with the action, nor am I

14   financially interested in the action.

15

16             In witness whereof I have hereunto set my hand

17   and seal this  22nd  day of  April, 2008.

18

19                         _____

20                         JACQUELYN ANN JONES

21                         Commission No. CC 995956

22                         Expires Feb 18, 2009

23

24

25
```



**ORDERED in the Southern District of Florida on April 23, 2008.**

Paul G. Hyman, Chief Judge
United States Bankruptcy Court

---

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:

SERVE-EM.COM,

     Debtor.

ROBERT A. GIBSON,

     Debtor.
_____/

WOODIE H. THOMAS III, P.A,

     Plaintiff(s),

v.

ROBERT A. GIBSON, *et al.*,

     Defendant(s).

_____/

CASE NO.:05-32460-BKC-PGH
CHAPTER 7

CASE NO.:05-36640-BKC-SHF
CHAPTER 7

ADV. NO.:08-1209-BKC-PGH-A ✓

ORDER DENYING REQUEST FOR REMOVAL AND
REMANDING CASE TO THE STATE COURT

**THIS MATTER** came before the Court for hearing on April 21, 2008, upon Robert A. Gibson's Amended Notice of Removal and Woodie H. Thomas III, P.A.'s ("Plaintiff") Motion to Strike. On May 8, 2003, Serve-em.com filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code. On February 18, 2005, the case was subsequently converted to a case under Chapter 7, and Michael R. Bakst was appointed as the Chapter 7 Trustee (the "Trustee"). On March 9, 2005, the bankruptcy court entered an *Order Granting Emergency Motion By Trustee Michael Bakst To Sell Property Free And Clear of Liens Claims Encumbrances and Interests With Any Liens Claims Encumbrances and Interests to Attach to Proceeds of Sale* (the "Sale Order"). Pursuant to the Sale Order, Donald Gibson purchased the assets of serve-em.com free and clear of all pre-petition liens, claims, encumbrances, and interests. The Trustee held a Post-Conversion Meeting of Creditors on March 27, 2008, and June 25, 2008 was established as the deadline to file proofs of claim.

On October 12, 2005, Robert Gibson filed a petition under Chapter 7 of the bankruptcy code. On February 4, 2006, the bankruptcy court entered an order discharging all pre-petition claims against Robert Gibson (the "Discharge Order"). Pursuant to 11 U.S.C. § 524(a), after entry of the Discharge Order, pre-petition claims against Robert Gibson were enjoined.

The Notice of Removal alleges that the Plaintiff is pursuing pre-petition claims against Robert Gibson and Serve-em.com and

seeks to remove the action to this Court. Plaintiff argues that the causes of action he is pursuing against Robert Gibson, Donald Gibson, or Airport Process, Inc. are independent of any pre-petition claim against Serve-em.com or Robert Gibson.

With the Court having been fully advised in the premises, it is hereby **ORDERED AND ADJUDGED** that:

1) Thomas is enjoined from pursuing pre-petition claims against Serve-em.com, the assets of Serve-em.com, or Robert Gibson.

2) Robert Gibson's request for removal is **DENIED** and the cause of action is remanded to the state court.

3) Robert Gibson's request for sanctions against Thomas is **DENIED**.

3) Thomas's Motion to Strike is **DENIED AS MOOT**.

### 

Copies Furnished To:

Robert A. Gibson
POB 6786
West Palm Beach, FL 33405

Serve-em.com
251 Royal Palm Way #600A
Palm Beach, FL 33480

Woodie H Thomas III, Esq
1603 Vision Dr
Palm Beach Gardens, FL 33418

Michael R. Bakst, Esq.

AUST

# United States Bankruptcy Court
## Southern District of Florida

Cite as: 345 B.R. 773

### Gustavo Adolfo Manzanares, Plaintiff, v.
### State Farm Fire and Casualty Company, Defendant
(In re Gustavo Adolfo Manzanares, Debtor)
Bankruptcy Case No. 04-10876-BKC-LMI-7
Adv. Case No. 05-1185-BKC-LMI-A

United States Bankruptcy Court
S.D. Florida

May 24, 2006

Victor K. Rones, Rones and Navarro, N. Miami Beach, FL, for plaintiff
Benjamine Reid, Carlton Fields, P.A., Miami, FL, for defendant

Thomas S. Utschig, United States Bankruptcy Judge

## MEMORANDUM OPINION, FINDINGS OF FACT,
## AND CONCLUSIONS OF LAW

This bankruptcy case began when the debtor filed a chapter 7 petition on February 5, 2004. The present dispute predates the bankruptcy, however, and unfortunately for all involved it did not die when the debtor received a discharge on May 6, 2004. What originated as a simple two-car accident and an obligation that both parties acknowledge would have been a dischargeable debt has devolved into an amazing comedy of errors featuring a dueling stream of accusations of improper service, lack of notice, violations of the discharge, and legal arguments about the propriety of the debtor's request for punitive damages against the defendant, State Farm Fire and Casualty Company. Ultimately, the case illustrates that when Hubert Humphrey once observed, "We believe that to err is human; to blame it on someone else is politics," he might as well have been speaking of litigation. In that regard, it is the Court's obligation to decipher which party bears the brunt of the blame for this litigious miasma.

The dispute began simply enough. On December 31, 2001, Mercedes Rondon and Roberto Diaz were in a car accident. Rondon was at fault and was driving a car owned by the debtor, who is her father-in-law. Neither she nor the debtor were insured at the time of the accident. Further complicating matters, Diaz was also driving a vehicle owned by someone else, namely, Maria Lopez and Loynaz

Cordova. Both Diaz and the car's owners were insured by State Farm.[1]  Diaz suffered injuries as a result of the accident, and there was also damage to the car.  As the personal injury and collision damages were suffered by two separate insured parties, however, State Farm elected to deal with the claims separately.[2]

After deducting the $500 deductible required under Lopez's insurance policy, State Farm paid roughly $7,000 in collision damages to Lopez for damage to the car. Meanwhile, after exhausting the $10,000 in personal injury benefits available under his State Farm policy, Diaz also made a claim for uninsured motorist benefits.  State Farm paid Diaz approximately $4,200 under this portion of his policy.  State Farm then referred both matters to its "subrogation unit."  From there, the Lopez claim was referred to an outside attorney, Stephen Shenkman, for collection.  Shenkman initiated a subrogation action in state court against the debtor and Rondon, seeking to collect $7,552.36 in damages.  Shortly thereafter, the Diaz claim was referred to the law offices of Odalys Nodarse-Buscemi, who brought an action against the debtor and Rondon in November of 2003 to collect the $4,200 in uninsured motorist benefits.

After these actions were filed, the debtor filed bankruptcy in February of 2004. The second lawsuit involving the Diaz uninsured motorist claim was listed on the debtor's schedules.  Notice of the bankruptcy was sent to State Farm's attorney, Odalys Nodarse-Buscemi.  As State Farm notes numerous times in its pleadings and during argument, no notice was sent directly to State Farm or to Shenkman, the attorney representing State Farm in the collision subrogation action.  However, Nodarse-Buscemi notified State Farm of the bankruptcy filing, and a representative in State Farm's subrogation department instructed Nodarse-Buscemi to dismiss the UM lawsuit because of it.

The competing complaints about poor or ineffective service arise at this point. State Farm accurately contends that the debtor did not list the collision subrogation action in his schedules, and that Shenkman did not receive personal notice of the bankruptcy.  According to the debtor, however, service of the collision subrogation lawsuit (handled by Shenkman) was delivered to a residence owned by his former spouse, and the debtor never received notice of the lawsuit.  From the debtor's

---

[1]  This coincidence can only be considered unfortunate, as everything else in the case springs from this one simple fact.

[2] There is some evidence in the record that both "claims" might have initially been processed under one State Farm claim number.  For whatever reason, it did not stay that way.

2

perspective, he was only aware of one lawsuit - the Diaz uninsured motorist action - and that is what he scheduled.[3]

In any event, Shenkman did not receive notice of the bankruptcy directly from the debtor. Further, State Farm did not notify him that the company had received notice of the bankruptcy in connection with the Diaz lawsuit. Blissfully unaware of the torrent of litigation he was about to unleash, Shenkman negotiated a settlement of the claims against Rondon, the debtor's daughter-in-law. On November 16, 2004, Shenkman obtained a default judgment in favor of State Farm against the debtor in the amount of $9,211.51. In March of 2005, Shenkman sent a letter to the Florida Department of Highway Safety and Motor Vehicles. In this letter, Shenkman informed the DMV that the debtor did not possess the state-mandated insurance on his vehicle. The letter also referenced the default judgment in the Lopez subrogation action, and requested that the DMV suspend the debtor's driver's license.

Unfortunately, some confusion regarding the names of the debtor and his son initially resulted in the suspension of the son's driver's license. Shenkman subsequently requested that the son's license be reinstated and asked again that the debtor's license be suspended. This request was granted on or about May 23, 2005. Two days later, the debtor's attorney contacted Shenkman by letter and enclosed a copy of the debtor's bankruptcy discharge. The debtor's attorney noted that the debt was "dischargeable" and that he intended to reopen the bankruptcy proceedings to effectuate that result.

According to Shenkman and State Farm, there were "immediate" discussions between the debtor's attorney and Shenkman's office to resolve the situation. Shenkman claims that it was his understanding that the debtor's attorney was going to reopen the bankruptcy proceeding and amend the schedules to list this debt. Once that was accomplished, Shenkman agreed to vacate the state court judgment and would direct reinstatement of the driver's license. However, according to the debtor's attorney, the debtor also sought to resolve the matter quickly by offering to pay State Farm $2,000.00. Shenkman's office rejected this offer.[4]

---

[3] Apparently, both lawsuits were served on the debtor at the residence of his former spouse. The evidence indicates that the debtor never resided at this address, although his son (who shares his name) did. When the Diaz lawsuit was served, it appears that the debtor's son was present and delivered the pleadings to his father. The same cannot be said of the Lopez collision action, and given the evidence of the acrimonious relationship between the debtor and his former spouse (including the entry of a domestic violence injunction), it is perhaps understandable why she did not alert him to the lawsuit.

[4] It remains a mystery why this offer was rejected. State Farm denies the allegation that it has
(continued...)

3

On June 22, 2005, the debtor filed this adversary proceeding. State Farm seems to suggest that in doing so the debtor somehow reneged upon the mechanism for resolving the dispute. Admittedly, the debtor did not simply reopen the bankruptcy proceeding and amend the schedules. However, the record clearly demonstrates that the debtor expected Shenkman to take affirmative action once he was presented with evidence that the debt was subject to discharge, if not discharged already. Shenkman did nothing to remedy the situation. Oddly enough, neither did State Farm. Despite being properly served with the adversary complaint, State Farm did not file a timely answer and a default was entered on July 25, 2005.[5] In the interim, the debtor's attorney contacted Shenkman with a proposed stipulation to vacate the state court judgment, and indicated that the stipulation could resolve the adversary proceeding. This offer was likewise rejected.

The debtor also filed a motion in state court to set aside the default judgment based upon the allegedly deficient notice and the intervening bankruptcy. Rather than concede on this point either, State Farm's attorney opposed the motion and delayed the hearing on the matter. When the debtor's motion was heard on August 29, 2005, Shenkman opposed both the request to vacate the judgment and the request to reinstate the debtor's driver's license. The state court deferred ruling on the matter until the bankruptcy court addressed the issue. As indicated previously, however, State Farm had failed to file an answer to the adversary complaint and a clerk's default had been entered. At the adversary pretrial on September 7, 2005, the court granted State Farm's request to vacate the default and allowed the debtor to amend the complaint to add a claim for punitive damages. Only after all of this did State Farm file a motion to vacate the state court final judgment. On October 5, 2005, the debtor finally learned that his driver's license had been reinstated.

At this point, the debtor now asks the Court to award both actual and punitive damages against State Farm for alleged violations of the automatic stay and the discharge injunction. The debtor wants an award of actual damages for the wages lost while he could not work as a delivery driver, as well as for the mental anguish

---

[4](...continued)
a policy of requiring "full payment" on a discharged debt, and also contends that Shenkman did not communicate the offer to State Farm. At trial, Shenkman did not clearly describe the basis for his decision, nor did he outline any counterproposals he made. According to his testimony, rather than accept a monetary settlement in exchange for releasing the judgment, he apparently expected the debtor would reopen the bankruptcy to discharge the debt, at which point State Farm would receive nothing for its pains.

[5] According to the debtor, State Farm was served through the Chief Financial Officer of the State of Florida on June 27, 2005. State Farm has not explained why no answer was filed or why it opted not to take any action until September of 2005.

and emotional distress associated with the loss of his driver's license. The debtor also believes that a sizeable punitive damage award and an award of attorney's fees would be appropriate in order to send a message that this type of behavior is unacceptable, and to encourage State Farm and other similarly-situated creditors to reform their policies. In order to do so, however, there are two principal questions which must be resolved. First of all, the Court must consider whether State Farm received adequate notice of the bankruptcy. Second, the Court must decide whether State Farm is responsible for Shenkman 's conduct in the prosecution of the Lopez claim.

As to the first issue, it is clear that the so-called "Lopez claim" was not specifically listed on the debtor's schedules. It is also true that the debtor did not serve a copy of the notice of bankruptcy to State Farm directly through Florida's Department of Financial Services. A notice of suggestion of bankruptcy was filed in the Diaz lawsuit, and State Farm appears to concede that it received actual notice of the bankruptcy as concerns that claim.[6] State Farm seems to concede that if Shenkman had received a similar notice, the Lopez action would likewise have been dismissed as a result of the bankruptcy.

Nonetheless, State Farm argues that the notice to Attorney Nodarse-Buscemi was defective because it did not sufficiently alert State Farm to the possibility that other claims (besides the Diaz lawsuit itself) were affected by the debtor's discharge. State Farm contends that in order to properly provide notice, the debtor would have needed to schedule both claims and serve the notice directly on State Farm itself (or, at the very least, notify both attorneys, which State Farm concedes would constitute "actual knowledge" of the bankruptcy, at least in the context of the individual claims in question). Because of this purported defect in notice, State Farm believes that the Lopez claim was not affected by the discharge and that the company did not engage in any "willful" violations of either the automatic stay or the discharge injunction.

Section 524 of the bankruptcy code operates as a post-discharge injunction against the collection of debts discharged in bankruptcy, and is appropriately characterized as "the embodiment of the Code's fresh start concept." In re Riser, 298 B.R. 469, 472 (Bankr. M.D. Fla. 2003); see also Hardy v. United States (In re Hardy), 97 F.3d 1384, 1388-89 (11th Cir. 1996); Mooney v. Green Tree Servicing, LLC (In re Mooney), 340 B.R. 351 (Bankr. E.D. Tex. 2006). As the Supreme Court recently stated, the protection afforded by the discharge is one of the "[c]ritical features of

---

[6] To the extent that State Farm was to contend otherwise, the Court finds that the facts conclusively demonstrate the receipt of "actual notice" as concerns the Diaz claim. Not only was the notice of bankruptcy delivered to State Farm's attorney in that case, but the attorney provided that notice to a State Farm representative, whom State Farm concedes thereafter authorized the dismissal of the Diaz lawsuit.

every bankruptcy proceeding." <u>Cent. Va. Cmty. College v. Katz</u>, __ U.S. __, 126 S. Ct. 990, 996, 163 L. Ed. 2d 945 (2006). In accordance with the provisions of § 524, a chapter 7 discharge affects all creditors by voiding the debtor's past liability for debts which are subject to the discharge, and permanently enjoins creditors from "chasing" debtors. <u>Jacobson v. Robert Speece Properties (In re Speece)</u>, 159 B.R. 314 (Bankr. E.D. Cal. 1993). Further, a judgment imposing personal liability against a debtor for a discharged debt is not merely voidable, but void. <u>In re Norvell</u>, 198 B.R. 697 (Bankr. W.D. Ky. 1996); <u>Costa v. Welch (In re Costa)</u>, 172 B.R. 954 (Bankr. E.D. Cal. 1994).[7]

Under 11 U.S.C. § 523(a)(3), however, there is an exception to discharge for a certain category of debts: namely, those which the debtor did not schedule. One of State Farm's principal arguments is that Shenkman's conduct did not violate the discharge injunction because the debtor did not schedule the Lopez claim and it was therefore not discharged under § 523(a)(3). Specifically, this section provides that an individual debtor may not discharge debts which were:

> [N]either listed nor scheduled under section 521(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit -
>
> (A) if such debt is not of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim, unless such creditor had notice or actual knowledge of the case in time for such timely filing; or
>
> (B) if such debt is of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim and timely request for a determination of dischargeability of such debt under one of such paragraphs, unless such creditor had notice or actual knowledge of the case in time for such timely filing and request.

The primary purpose of this discharge exception is fairness to those creditors who, through no fault of their own, were somehow prejudiced by not having the opportunity to protect their rights and assert their interests. The statute recognizes that such creditors might be prejudiced by being denied either a meaningful participation in the distribution of assets or the ability to challenge the dischargeability of their claim for one of the reasons enumerated in §§ 523(a)(2),

---

[7] As the court noted in <u>Mooney</u>, the discharge is a "cornerstone" of bankruptcy law, providing debtors with a "new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." 340 B.R. at 351. Given the primacy of the discharge, it must be enforced in order to provide meaningful protection to those seeking refuge in bankruptcy, and a violation of the discharge must be recognized for what it is: the denial of one of the primary benefits of our bankruptcy system. <u>Id.</u>

6

(a)(4), and (a)(6).  Consequently, the code contemplates, and § 523(a)(3) codifies, the notion that debtors are expected to exercise reasonable care and diligence in assembling and filing with the bankruptcy court accurate information concerning their creditors.  In re Blossom, 57 B.R. 285 (Bankr. N.D. Ohio 1986).

In In re Bowen, 89 B.R. 800 (Bankr. D. Minn. 1988), the court noted that the debtor has an "absolute duty" to identify all persons or entities which may hold or assert claims against the estate.  The purpose of this obligation is to provide "adequate notice" to creditors of the potential effect the bankruptcy might have on their rights.  Id. at 805.  As the court stated in Chanute Prod. Credit Ass'n v. Schicke (In re Schicke), 290 B.R. 792, 801 (B.A.P. 10th Cir. 2003), "[A] debtor who seeks the benefit of a discharge has a duty to notify creditors affected by the discharge of his or her case to allow them an opportunity to object thereto."

Given that the purpose of the exception is one of fundamental fairness, however, the statute also provides that an unscheduled creditor who has "actual knowledge" of the bankruptcy case will nonetheless find its claims discharged.  In this regard, the debtor's duty to afford due process to creditors is "counterbalanced by the creditors' duty to object to the discharge of a debt if it has *any* notice or knowledge of a Chapter 7 case prior to the expiration of the time limitation" found in the code and bankruptcy rules.  Id. at 800.  Creditors who have timely, actual knowledge of a case but fail to receive "official" notice of it nonetheless have a burden to come forward before the bar date in order to object to the discharge of their claims.  GAC Enters. v. Medaglia (In re Medaglia), 52 F.3d 451, 455 (2<sup>d</sup> Cir. 1995). Due process is not offended by requiring that a person with actual, timely knowledge of an event "take necessary steps" to preserve its rights.  Id.

The threshold inquiry under § 523(a)(3) is therefore whether the creditor received notice or possessed "actual knowledge" of the bankruptcy case.  A creditor who does not receive "formal" notice of the filing of a bankruptcy case but who nonetheless has actual knowledge shortly after the filing will be bound by the discharge.  In re Green, 876 F.2d 854 (10th Cir. 1989).  Where a creditor has actual knowledge of the bankruptcy in time to protect its rights, its claim will not be excepted from discharge under § 523(a)(3).  Goodwin v. United States Fid. & Guar. Ins. Co. (In re Goodwin), 215 B.R. 710 (Bankr. W.D. Tenn. 1997).  As the court stated in Bowen:

> [Section 523(a)(3)] is not intended as a safe haven for creditors with actual knowledge of a pending bankruptcy case who neglect to promptly evaluate and advance their interests in the case.  Rather, it is intended to act in organic conjunction with numerous other provisions of the Bankruptcy Code and Rules, which operate on the understanding that debtors and creditors in bankruptcy cases have independent

7

obligations to safeguard their own interests in anticipation of the grant
of discharge in bankruptcy. The debtor has an absolute duty to identify
and schedule all persons or entities who may hold or assert claims
against the bankruptcy estate and, hence, to afford adequate notice to
creditor-claimants of the effect of the case on their rights (citations
omitted). Once the debtor has done this, or once an unscheduled
creditor has received actual notice of the pendency of a bankruptcy
case, the creditor-claimant has the clear obligation to take affirmative
steps to evaluate, advance, and protect its rights.

89 B.R. at 805.

Put most simply, creditors who learn of a debtor's bankruptcy are not entitled
to sit back and demand "formal" notice. Their claims are subject to discharge unless
they take affirmative action in the face of their knowledge. For purposes of the
statute, "actual knowledge" means that the creditor possessed knowledge of facts
sufficient to apprise the creditor that a case was actually filed, and where the
proceeding was pending. In re Layman, 131 B.R. 495 (M.D. Fla. 1991). In a case
involving an unscheduled creditor who sought an extension of time in which to file a
nondischargeability action, the Eleventh Circuit stated:

The statutory language clearly contemplates that mere knowledge of a
pending bankruptcy proceeding is sufficient to bar the claim of a
creditor who took no action, whether or not that creditor received
official notice from the court of various pertinent dates. This furthers
the bankruptcy policy of affording a "fresh start" to the debtor by
preventing a creditor, who knew of a proceeding but who did not
receive formal notification, from standing back, allowing the bankruptcy
action to proceed without adjudication of his claim, and then asserting
that the debt owed to him is undischargeable.

In re Alton, 837 F.2d 457, 460 (11th Cir. 1988). In Alton, the court concluded that "once
warned of the bankruptcy proceeding," the unscheduled creditor could have made "a
minimal effort" to ascertain the last date to object to discharge and did not do so. Id.
at 461. Accordingly, his claims were discharged.

The present case was a no asset chapter 7, in which there was never a date by
which creditors were to file proofs of claim. State Farm does not allege that its claim
was subject to any of the exceptions to discharge found in § 523(a)(2), (a)(4), or (a)(6).
Not only did one of State Farm's attorneys receive notice of the bankruptcy, but that
attorney forwarded the notice to a representative in State Farm's subrogation unit
shortly thereafter. State Farm was clearly apprised of the bankruptcy well in advance
of the debtor's discharge. All of this would seemingly suggest that *both* of State

8

Farm's subrogation lawsuits were discharged in the debtor's bankruptcy. However, State Farm asserts that its size as a behemoth of the insurance industry justifies the conclusion that the notice was defective and that it did not have sufficient "actual knowledge" of the bankruptcy so as to discharge the Lopez claim.

On a purely factual level, State Farm offers up a series of what it believes to be salient details. For example, State Farm's subrogation unit handles "tens of thousands" of claims a year. The Lopez and Diaz claims were separated internally, handled by different claims representatives, and farmed out to different attorneys to litigate. There was apparently no coordination between the claims agents or the attorneys. According to State Farm's corporate representative, the actions were separated as they involved "separate policies, separate insureds, separate types of claims, separate investigations, and sought separate types of damages."[8] State Farm complains that because the debtor sent the notice of the bankruptcy to the attorney, rather than to State Farm directly, "there was no process in place" to communicate the matter "to the company as a whole" or to alert the claims representative that other claims might be affected.[9]

As indicated previously, this is not the typical § 523(a)(3) case in which the debtor utterly fails to schedule a creditor. State Farm was in fact scheduled, and the notice went to the attorney handling one of the two subrogation matters. State Farm's argument is that this notice was somehow inherently defective (and that the claims representative's "knowledge" of the bankruptcy in the context of the Diaz lawsuit cannot satisfy the code's "actual knowledge" requirement). There are indeed scenarios under which defective notice to a large company can prevent the discharge of a debt. For example, in National Union Fire Ins. Co. v. Main (In re Main), 157 B.R. 786 (W.D. Pa. 1992), the debtor listed nothing more than the creditor's name and a street address. The court noted that National Union was a company with over 30,000 employees, and that "upon receipt of the notice in its mailroom, [they] would not have been able to determine the person within the corporation to whom the notice

---

[8] As noted during the trial, however, it would appear that at least initially these claims were assigned the same claim number by State Farm's centralized subrogation unit. From the record, it appears that State Farm's decision to "split" the actions was largely a matter of administrative convenience.

[9] Intriguingly, this contention seems to be contradicted by Shenkman's own testimony, in which he states that he has handled subrogation matters for State Farm for approximately 20 years, and "cannot recall any instance where State Farm advised me about a bankruptcy relating to one of my cases." According to Shenkman, he "usually" receives bankruptcy notices on behalf of State Farm in the context of his subrogation cases, and he then informs the company about the bankruptcy.

should have been forwarded in order to determine what action, if any, should be taken with regard to the notice." Id. at 788.[10]

Clearly, a creditor who has been "incorrectly" listed in the debtor's bankruptcy schedules is often properly treated in similar fashion to the creditor who was not listed at all.  As the court noted in In re Compton, 891 F.2d 1180, 1184 (5th Cir. 1990), a deficient listing leaves a creditor "in the same position as unscheduled creditors" if the deficiency results in a lack of notice.  In the context of § 523(a)(3), if a debtor incorrectly lists the name or address of a creditor so as to cause the creditor not to receive notice, the creditor's debt has not been "duly scheduled," and if the creditor has no actual knowledge of the bankruptcy, the creditor's debt is not dischargeable. Id.; see also In re Adams, 734 F.2d 1094, 1098 (5th Cir. 1984).  However, it is hardly "deficient" to send notice of the bankruptcy to the attorney handling a claim, as the attorney is normally the creditor's agent in the context of the litigation.  Schicke, 290 B.R. at 801; see also Alton, 837 F.2d at 461 (notice of bankruptcy served on creditor's attorney sufficient to require creditor to contest dischargeability).

Serving the notice of bankruptcy upon the attorney may not strictly conform with the requirements of Fed. R. Bankr. P. 1007(a), which provides that the debtor must file a list containing the "name and address" of each creditor.  The forms promulgated by the Judicial Conference of the United States also indicate that the debtor should list the creditor's name, mailing address, and account number.  It must be conceded that listing a creditor in care of an attorney does not properly conform to the letter of these rules.  Barnes v. Sawyer (In re Barnes), 326 B.R. 832 (Bankr. M.D. Ala. 2005).  At the same time, however, notice to the attorney may well be *sufficient* under the "facts and circumstances" of the particular case.  Id. at 839.  Here, such service is clearly consistent with Shenkman's testimony that the "usual" practice over his twenty year association with State Farm has been for him to receive bankruptcy notices on behalf of the company, which would presumably mirror the experience of other attorneys handling subrogation matters for State Farm.[11]  In any event, the attorney who received the notice for State Farm forwarded it to a subrogation representative, and State Farm itself thus "received" notice.

As State Farm has pointed out, there are certainly scenarios under which notice to a single representative might not constitute notice to a huge corporation or

---

[10] This can be contrasted to the present case, in which a litigation attorney and a subrogation claims representative were both informed of the bankruptcy.

[11] The debtor has also noted the ironic reality that when State Farm was served with the adversary complaint in accordance with its alleged "preferred" service mechanism, the company failed to answer and a default was entered.  In contrast, notice to Attorney Nodarse-Buscemi was forwarded to the company and generated an instruction to dismiss the Diaz lawsuit.

governmental agency.  See United States Small Business Admin. v. Bridges, 894 F.2d 108 (5th Cir. 1990); In re Senall, 64 B.R. 325 (Bankr. M.D. Fla. 1986); In re Paul, 194 B.R. 381 (Bankr. D. S.C. 1995).  In each of these cases, the courts concluded that the creditor had not received sufficient knowledge of the debtor's pending bankruptcy.  State Farm contends that the facts of this case are sufficiently aligned with these authorities as to justify a similar result.

In Bridges, the debtor was personally obligated on two loans to the Small Business Administration.  At the same time, the debtor's corporation was the guarantor on an unrelated loan which was handled by a separate branch of the SBA.  Both the corporation and the debtor filed bankruptcy.  In the corporate case, the SBA was scheduled as a creditor and received notice of the bankruptcy.  In the personal bankruptcy, however, the SBA was not listed as a creditor and never received any notice of the case.  During the course of reviewing documents in the corporate reorganization, an in-house SBA attorney learned of the debtor's personal bankruptcy.  This attorney, however, had no involvement with the debtor's personal loans, which were handled by a separate branch office.

When the SBA filed suit to recover on the personal loans, the debtor argued that the SBA had received "actual knowledge" of the bankruptcy and that the claims were discharged.  The court first noted that in the context of a large and "cumbersome agency," debtors would be wise to take steps to assure "timely and meaningful notice."  894 F.2d at 111. In that regard, determining whether notice is adequate often depends upon the "facts and circumstances" of the particular case.  Id. As the Bridges court phrased it, the question was whether "the personal knowledge of personnel in a branch SBA office--a branch unconnected and unfamiliar with [the debtor's] indebtedness to the SBA--should be imputed to the SBA under the circumstances presented."   The court's conclusion was that it should not:

> A notice from the bankruptcy court of an individual debtor's bankruptcy filing alerts a creditor that it has been scheduled in that individual's bankruptcy case.  The SBA received no notices at all regarding [the debtor's] personal bankruptcy, since [the debtor] failed to schedule it as a creditor.  Instead, an attorney in a branch office unconnected with the loans made to [the debtor] discovered [the debtor's] name and bankruptcy case number in the caption of documents relating to a joint plan of reorganization filed in an ongoing bankruptcy proceeding of the SBA's known debtor. . . .  It appears that the SBA's Biloxi office . . . reasonably assumed that these notices were merely additional documents in the continuing [corporate] bankruptcy . . . .  Such misinformation cannot satisfy the notice requirements envisioned by the Bankruptcy Code or by the fourteenth amendment's due process clause.

11

Id. at 112.

Likewise, in Senall, the debtor provided notice of the bankruptcy to a Pasadena branch of the Bank of America National Trust and Savings Association regarding a deficiency claim on an airplane loan. The debtor did not notify the Los Angeles branch of the bank, which served as trustee of a profit sharing plan, of the bankruptcy. The court concluded that notice to one branch was not notice to the other, and stated that "[t]he Debtor never sought to notice the Bank of America in Los Angeles in its capacity as trustee, and the Debtor cannot preclude a challenge to dischargeability because of his own failure to notify and schedule his creditors." 64 B.R. at 327.

Finally, in Paul the debtor sought to reopen his case in order to schedule an omitted creditor. The debtor had personally guaranteed an obligation that his partnership owed NationsBank. When he filed bankruptcy, he did not schedule this claim, although he did apparently schedule an unrelated NationsBank credit card debt. The court concluded that the debtor failed to demonstrate that the bank had notice of the bankruptcy in the context of the guaranty. The court also found that the bank would be prejudiced if the case were reopened because it would be impossible for NationsBank to object to the treatment of unsecured creditors under the debtor's confirmed chapter 11 plan. In particular, the court stated:

> To simply allege that NationsBank had notice because a credit card debt was scheduled ignores the fact that NationsBank is a $200 billion dollar lending institution with thousands of employees in several states and numerous divisions responsible for different types of loans and obligations. The Debtor has failed to meet his burden of showing that NationsBank had notice that the Debtor was in bankruptcy and that the Debtor was attempting to discharge the obligation related to the guaranty of payment in the bankruptcy case.

194 B.R. at 384.

State Farm's argument is that it should be treated in a similar fashion. It points out that the two claims involved "separate State Farm policies and insureds." Two separate law firms were involved. Only one local attorney received notice, who then informed "one State Farm claims representative." State Farm contends that as a "large, national insurance company" with thousands of employees and hundreds of offices throughout the United States, it is not only unfair to conclude that State Farm had "actual knowledge" of the debtor's bankruptcy but would also violate State Farm's due process rights.

12

This, however, is an overly broad reading of the authorities cited, especially under the facts of the case before the Court.  As stated in <u>Bridges</u>, whether notice to an agency (or, as here, a large, national company) is adequate "depends upon the facts and circumstances of a given case."  894 F.2d at 111.  The facts of this case are actually quite different from those found in the cases cited by State Farm.  Each of those cases not only involved separate branches or divisions of the creditors, but there was also a dramatic distinction between the character of the obligations at issue.

This is perhaps most notable in <u>Bridges</u>, where it was not only important that two different branches of the SBA were involved, but also that one obligation was a corporate debt and the others were personal obligations in the individual debtor's separate case. While State Farm contends that there are two separate subrogation claims at issue here, they stem from the same set of operative facts and are in fact simply two facets of a singular obligation stemming from one automobile accident. State Farm separated the claims for some sort of administrative convenience, but they were not separate transactions nor do they represent truly separate liabilities along the lines of the claims outlined in <u>Bridges</u>, <u>Senall</u>, or <u>Paul</u>.

Further, while State Farm emphasizes the fact that one seemingly insignificant claims representative received the notice of bankruptcy as regards the Diaz claim, it is important to note that representative's role.  This was not a notice delivered to an isolated agent at one of State Farm's numerous branches.  This was notice received by a member of State Farm's subrogation unit – the very unit State Farm utilizes to handle the prosecution of subrogation claims.  Admittedly, as Mark Weller, State Farm's corporate representative, testified at trial, that unit handles thousands of claims annually.  But if, as the <u>Bridges</u> court noted, a notice of an individual debtor's bankruptcy "alerts a creditor that it has been scheduled in that individual's bankruptcy case," the Court must determine what to make of the fact that a member of the unit dedicated to the prosecution of subrogation claims learned that State Farm had been scheduled in the debtor's bankruptcy case.

Intriguingly, State Farm's corporate representative testified that State Farm has a system in place which would have avoided further prosecution of the Lopez claim "if State Farm had been properly served in accordance with Florida law."  According to Mr. Weller, if the notice of bankruptcy had been served through Florida's Department of Financial Services, the notice would have been routed to the accounting department.  According to Mr. Weller's direct testimony:

> The accounting department then performs a search of State Farm's database, wherein it could determine whether a claim is left open in our subrogation department against the individual that has filed bankruptcy.

What makes this so curious is his subsequent assertion that a claims representative *in that very subrogation department* would seemingly not consider doing the same thing, or that it would not be part of State Farm's standard operating procedure.[12] After all, if a member of State Farm's subrogation department receives notice of an individual debtor's bankruptcy, it is at least notice that all *subrogation* claims against that debtor are potentially subject to discharge, even if it might not be appropriate to extend that notice to other obligations outside the scope of the subrogation unit.

Indeed, there are a number of cases which reflect the fact that a creditor is not entitled to simply sit back and do nothing with the notice it receives. Once a creditor has received actual notice of the case, the creditor has a clear obligation to take "affirmative steps" to evaluate, advance, and protect its rights. Bowen, 89 B.R. at 805. As the Eleventh Circuit has itself stated, once "warned" of a bankruptcy, a creditor cannot rely upon § 523(a)(3) and must instead make at least "minimal effort" to contest the dischargeability of its claims. Alton, 837 F.2d at 461. Further, as long as a creditor is listed in the debtor's initial schedules, the creditor is presumed to be responsible for ascertaining the specific claims it holds. In re Mandukich, 87 B.R. 296 (Bankr. S.D. N.Y. 1988). Having made no effort to ascertain the extent of its claims against the debtor, State Farm "cannot now properly complain of the consequences" of its inaction. Alton, 837 F.2d at 461.

The adequacy of notice often hinges upon the facts of the particular case. Bridges, 894 F.2d at 111. Given the possible continuum of notice scenarios, the code of necessity contemplates a balancing of the corresponding obligations of debtors and creditors. The debtor must give the creditor adequate notice of the bankruptcy, and the creditor is then obligated to take reasonable steps to protect its interests. Creditors have a duty to act to protect their rights once they have actual knowledge of the bankruptcy. Schicke, 290 B.R. at 801. Here, State Farm really cannot complain that it received inadequate notice of the bankruptcy itself, as both its attorney and its claims representative actively knew of it. The question, really, is whether it was reasonable of State Farm to do nothing more once it learned of the existence of the bankruptcy. In cases such as Bridges it was clearly unreasonable to believe that the creditor received sufficient notice as to make it aware that an unrelated claim against another party might be subject to discharge.

---

[12] This seems even more mysterious given Shenkman's assertion that in twenty years of representing State Farm, the company has never notified him of a pending bankruptcy. Instead, he has "usually" received the notice himself, and forwarded it to the company – ostensibly to the claims representative handling the case. If Shenkman's experience was typical, one must assume that State Farm's asserted "system" catches very few of the notices of bankruptcy served upon litigation counsel. This seems highly counterintuitive, to say the least.

14

In the present case, the Court is compelled to conclude that there is far too much unity in terms of the corporate department which received the notice, the basis for the claims, and the likelihood of possible discharge for the Court to agree with State Farm. The company clearly received sufficient notice to give it both notice and "actual knowledge" of the debtor's bankruptcy proceeding. State Farm received notice, not only to the attorney handling that matter but to a representative of the very unit handling two "claims" that arose from the same set of operative facts. State Farm and its agents simply failed to take sufficient action in the wake of that knowledge. Had they done so, they could have easily prevented the possible violation of the debtor's discharge. To paraphrase the Eleventh Circuit, once it received notice of the debtor's bankruptcy, State Farm's representatives only needed to exercise a "minimal effort" to determine whether the company held additional subrogation claims against the same debtor. Alton, 837 F.2d at 461.

It is intriguing to contrast this situation with Paul, one of the cases cited by State Farm and the one which is perhaps most analogous to the present situation. In Paul, NationsBank's credit card division received notice of the bankruptcy. The debtor's guaranty of a different debt, handled by a different division within the bank, was not scheduled. The court concluded that the guaranty debt was not discharged. Clearly, however, the disparate nature of the obligations was a critical component of the court's decision; it would be difficult to see the same outcome arising if, for example, the debtor owed two debts to the same branch or division of the bank and only scheduled one of them. Similarly, the outcome of Bridges or Senall might well have been different if the same branch, unit, or division of the creditor was handling both claims. In such a situation, the unscheduled debt would properly be discharged because the division or unit would be obligated to ascertain which "specific debts" it held might be subject to discharge. Mandukich, 87 B.R. at 300. The same is true in this case.

When the smoke dissipates from State Farm's arguments, all that is left is a simple reality: the debtor's liability in both lawsuits was premised upon the fact that he was the owner of a vehicle which was involved in one accident. He was not obligated to State Farm on an unrelated debt in some distant forum. There was, in essence, one "debt" comprised of two components. Both lawsuits were handled by the very unit that received notice of the bankruptcy. State Farm chose to sever its claims into separate lawsuits, and thereafter made a conscious decision, through its agents, not to make any effort to determine whether additional subrogation claims might be subject to the debtor's discharge. State Farm clearly had "actual knowledge" of the bankruptcy, and the "unscheduled" Lopez claim was therefore discharged when the debtor received his discharge in May of 2004.

Further, State Farm's efforts to point out the debtor's "failure" to notify it of the bankruptcy in the context of the Lopez claim overlooks one essential fact: the debtor

15

was not aware of the claim.  The record conclusively establishes that neither lawsuit was actually served at the debtor's place of residence.  They were instead served at the residence of the debtor's former spouse.  The evidence is consistent with the debtor's story that his son happened to be at the residence when the Diaz lawsuit was served and took the pleadings to his father.  It is notable that the debtor interposed a defense to this lawsuit in state court and subsequently listed it on his bankruptcy schedules.  He filed no response to the Lopez lawsuit and did not list it in his bankruptcy petition.  This inconsistency in behavior can only be explained by the fact that he did not receive notice of the Lopez claim.  He did not receive notice of the claim because State Farm served it in the wrong place.

Given this, the debtor was undoubtedly unaware of State Farm's unilateral election to separate two claims that arose from the same set of operative facts.  When the debtor listed the Diaz claim on his schedules, he clearly listed the only claim he thought State Farm held against him.  As such, it is inappropriate to demand that the debtor schedule a debt which he does not realize exists.  See Aetna Cas. & Sur. Co. v. Wilson (In re Wilson), 200 B.R. 72 (Bankr. M.D. Fla. 1996) (Section 523(a)(3) was not applicable as the creditor was not "known by the Debtor as an entity which was or might assert a claim").

As the Lopez claim was in fact discharged in May of 2004, the Court must now consider whether State Farm violated the discharge injunction.  Section 524 provides that the discharge operates as an injunction against the commencement or continuation of an action or any act to "collect, recover, or offset any dischargeable debt."  After the debtor's discharge, Shenkman proceeded to take a judgment against the debtor and also took affirmative steps to suspend the debtor's driver's license.  The debtor contends that these actions, together with the creditor's apparent recalcitrance about rectifying the situation once alerted to the existence of the discharge, justify the imposition of actual and punitive damages for a "willful" violation of the discharge injunction.[13]

In Hardy v. United States (In re Hardy), 97 F.3d 1384 (11th Cir. 1996), the Eleventh Circuit considered the question of a creditor's liability for violating a debtor's discharge.  The court noted that § 524 does not expressly provide for anything other than injunctive relief.  While declining to ground an award of damages under an "inherent" contempt power, the Hardy court nonetheless concluded that a

---

[13] The parties have argued extensively about whether punitive damages may be awarded in this case.  State Farm contends that punitive damages could be awarded for a violation of the automatic stay under § 362, the debtor has not proven that the stay was in fact violated.  State Farm also argues that neither 11 U.S.C. § 105 nor the court's "inherent powers" permit the imposition of punitive damages for a discharge violation.  As the Court declines to award punitive damages for the factual reasons discussed below, these legal issues are not addressed.

16

monetary award could be authorized under 11 U.S.C. § 105. Section 105(a) provides that the court may issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." This broad language encompasses any type of order, be it injunctive, compensatory, or punitive, as long as it is designed to effectuate the provisions of the code. Id. at 1389. As such, a creditor who violates the discharge may be cited for contempt and subject to sanctions. Id. at 1389-90.

Under § 105, a creditor may be liable for contempt if it "willfully" violated the discharge injunction. Id. at 1390; see also Jove Eng'g v. IRS, 92 F.3d 1539 (11th Cir. 1996); Havelock v. Taxel (In re Pace), 67 F.3d 187, 193 (9th Cir. 1995). The Eleventh Circuit has adopted a two-part test to determine the willfulness of a creditor's discharge-related conduct. A creditor may be found in contempt if they (a) knew of the discharge and (b) intended the actions which violated the discharge. Hardy, 97 F.3d at 1390; Jove, 92 F.3d at 1555; In re Lowthorp, 332 B.R. 656, 659 (Bankr. M.D. Fla. 2005).

It is important to note what this test does not require: namely, specific evidence of the creditor's deliberate intent to engage in conduct which violates the discharge. According to the Eleventh Circuit, in the context of civil contempt the inquiry does not focus on the "subjective beliefs or intent" of the creditors, but upon whether their conduct did in fact comply with the order in question. Howard Johnson Co. v. Khimani, 892 F.2d 1512, 1516 (11th Cir. 1990). According to Hardy, an award of sanctions for a violation of the discharge may be premised upon the fact that the creditor both received notice of the bankruptcy (and was thus "aware of the discharge injunction") and also intended the actions which violated the discharge. Hardy, 97 F.3d at 1390.

In this regard, State Farm argues that Shenkman's conduct cannot be imputed to the company for purposes of liability. For example, State Farm's representative stated that the company did not direct Shenkman to obtain a default judgment against the debtor, nor did it tell Shenkman to request the suspension of his driver's license. State Farm contends that the first it learned of *any* of the bankruptcy-related aspects of the Lopez claim was after the debtor filed this adversary proceeding. Accordingly, State Farm suggests that even if it did "know" of the bankruptcy, it did not "intend" to violate the discharge because it never directed Shenkman to do anything.

The debtor acknowledges that Shenkman did not have any personal knowledge of the debtor's bankruptcy. But State Farm did; as is discussed above, State Farm's subrogation unit had actual knowledge of the debtor's bankruptcy and did nothing about it. Indeed, despite this knowledge, State Farm permitted its agent to continue collection actions against the debtor. State Farm clearly intended that its

attorney would prosecute the subrogation claim to the fullest extent permitted by law. According to Shenkman, he handled this case much as he did every other case he prosecuted on behalf of State Farm. And State Farm knew that absent instructions to the contrary, Shenkman would carry out the terms of his representation: he would litigate the subrogation claim if necessary, obtain a judgment if possible, and take steps to collect upon that judgment. State Farm clearly "intended" that Shenkman do these very things, or the file would never have been sent to his office in the first place.[14]

Had Shenkman been the only one notified of the bankruptcy, failed to inform State Farm, and thereafter continued to prosecute the subrogation action, it would be fair to consider whether State Farm should be punished for the actions of an ostensibly "rogue" agent. In the context of this case, however, State Farm itself was aware of the bankruptcy and simply failed to rein in its hired gun. But for State Farm's failure to act, there would have been no judgment, no suspension, and no damage to the debtor. In the context of agency law, this is not a matter of punishing the principal for the actions of a wayward agent. It is instead an example of a principal who failed to adequately inform its agent of known facts – facts which would have dramatically altered the agent's course of conduct.

Pursuant to the "imputed knowledge" rule of agency, knowledge possessed by an agent is often imputed to the principal for purposes of liability under the theory that when an agent acts in the scope of the agency relationship, there is an "identity of interests" between the principal and agent. See Siharath v. Citifinancial Servs. (In re Siharath), 285 B.R. 299, 304 (Bankr. D. Minn. 2002). State Farm contends that Shenkman's actions, to the extent that they violated the discharge injunction, cannot properly be imputed to the company because Shenkman never communicated the details of his dealings with the debtor to anyone at State Farm. While State Farm may well accurately restate the principle that a client may not be responsible for the willful conduct of an attorney when the client did not direct the specific action in question, that concept as stated is inapplicable to this case. State Farm, the principal,

---

[14] State Farm contends that it never "directed" Shenkman to do certain things, such as obtain a judgment or seek the suspension of the debtor's license. State Farm also says that it was not informed of the discussions between Shenkman and the debtor after the license was suspended. It seems odd that there would be so little contact between State Farm and its attorney, but ultimately the evidence reflects that Shenkman's instructions from State Farm were to collect the subrogation claim from the debtor, and that is exactly what Shenkman attempted to do. State Farm's implicit suggestion that somehow Shenkman overstepped the bounds of his authority is somewhat disingenuous given that his principal actions were entirely consistent with the stated purpose of his representation. His subsequent conduct once notified of the bankruptcy discharge is admittedly questionable, but State Farm itself compounded the problem by failing to answer the adversary complaint despite direct service.

possessed knowledge that Shenkman, the agent, did not have.  The question is which of these parties is culpable in the context of the violation of the debtor's discharge.

It is a well-settled tenet of agency law that a principal's undisclosed knowledge is not imputed to the agent.  Id.  As the court stated in AGO v. Begg, Inc., 705 F. Supp. 613, 617-18 (D. D.C. 1988), while agency law often holds a principal responsible for knowledge possessed by the agent, "it sensibly does not hold agents responsible for knowledge known only by the principal."  The law presumes that an agent will "perform his duty" and inform the principal of any facts acquired in the scope of the agency relationship, and thus often holds the principal responsible for that knowledge.   This rule does not operate in the converse, however, and an agent "cannot be imputed with the information which its principal has failed to give." Siharath, 285 B.R. at 304.

In the case of Faust v. Texaco (In re Faust), 270 B.R. 310 (Bankr. M.D. Ga. 1998), Texaco was served with notice of the debtor's bankruptcy.  Nonetheless, the company referred the debtor's account to a debt collection agency.  When the debtor sought damages against both Texaco and the debt collector, Texaco argued that it did not have "actual notice" of the bankruptcy.  The court disagreed, finding that Texaco did in fact receive the bankruptcy notice and thus willfully violated the debtor's discharge.  The court declined to award damages against the debt collector, however, citing the aforementioned rule that an agent cannot be imputed to possess information which the principal failed to provide.  Id. at 317.

Similarly, in Siharath, the creditor received notice of the bankruptcy and attempted to send a letter to its law firm instructing it to cease all collection activities.  Unfortunately, the letter was actually sent to the debtor instead of the law firm, and so the attorney continued to pursue collection of the claim, including obtaining a default judgment and sending the debtor a notice of intent to levy upon wages.  When the debtor sought damages against both parties, the court granted summary judgment on behalf of the law firm because the attorneys had not been provided with critical information known only to the principal (namely, that the debtor had filed bankruptcy).  However, the court allowed the debtor to proceed with certain claims against the creditor, as the court found that the creditor had willfully violated the automatic stay because it "had knowledge of the commencement of the [debtor's] bankruptcy yet continued, through its agent . . . to attempt collection of its debt."  285 B.R. at 305.[15]

---

[15] These cases also illustrate the reality that few creditors come into bankruptcy court and brag about their violations of either the automatic stay or the discharge.  Instead, creditors attempt to minimize the importance of their actions, downplay the "willfulness" of their conduct, and discount the reality of any harm to the debtors.  Rare indeed is the creditor who claims to have brazenly

(continued...)

A principal is obligated to provide an agent with adequate instructions and warnings, and a principal may be held responsible for harm which results from the failure to disclose known facts to the agent.  See Restatement (Second) of Agency §§ 256, 435, 509, and 510.  The clear result of all of this is that when a creditor knows of a debtor's bankruptcy and its attorney does not, it is the creditor who must bear the ultimate responsibility for the attorney's collection efforts.  If the discharge is violated in such a situation, it must be said to have been violated by the creditor, because it was the creditor who failed to act upon the information in its possession.

The facts before the Court compel the conclusion that State Farm knew of the debtor's bankruptcy and also intended for its attorney to collect upon the Lopez claim.  Clearly, State Farm is responsible for not informing Shenkman of the bankruptcy; State Farm is likewise responsible for the injuries that flowed from Shenkman's pursuit of the subrogation claim in violation of the discharge.  An award of compensatory damages and attorney's fees is therefore appropriate.  Hardy, 97 F.3d at 1390; see also In re Bock, 297 B.R. 22 (Bankr. W.D. N.C. 2002) (creditor and attorney liable for compensatory damages for willful violation of discharge); In re Mooney, 340 B.R. 351 (Bankr. E.D. Tex. 2006) (debtor entitled to reasonable attorney's fees and punitive damages for creditor's willful violation of discharge injunction).

The debtor has requested an award of actual damages for lost wages, emotional distress, and the upheaval associated with the loss of his driver's license. The debtor has also asked for punitive damages and attorney's fees.  While State Farm's actions clearly constitute a willful violation of the debtor's discharge, under the peculiar facts of this case it is unclear whether State Farm truly acted with the sort of "egregious, intentional misconduct" generally considered necessary for a punitive damage award.  See Siharath, 285 B.R. at 305.  At the same time, the loss of his driver's license for almost six months and the attendant legal costs associated with finally compelling State Farm to honor the discharge constitute significant harm to the debtor.  The court finds that an award commensurate with these injuries should be sufficient to compensate for the severity of State Farm's conduct, and that punitive damages will therefore not be considered.

---

[15](...continued)
disregarded a bankruptcy notice; far more common are those who suggest that the notice was misplaced, misfiled, or misdirected.  Under the standards set forth in Hardy, such conduct may still result in a "willful" violation of the discharge, and appropriately so.  Given that the discharge is the "cornerstone" of the bankruptcy system and is a "critical feature" of virtually every individual bankruptcy, see Katz, 126 S. Ct. at 996, creditors must be held accountable for their lack of care and negligence in these instances.  Faust, 270 B.R. at 315-16.

In addition to the evidence regarding his lost wages, the debtor introduced a "journal" purporting to document his contemporaneous emotional state as he waited for his license to be reinstated.  While the journal contains numerous entries which are essentially cut and pasted into the document, several facts cannot be disputed.  First of all, the debtor worked as a truck driver.  While he was reassigned by his employer to other duties, there do appear to be some lost wages associated with this reassignment.  Further, the debtor clearly feared the loss of his job as a result of the suspension.  And finally, in contemporary America the lack of a vehicle, or the sudden inability to drive one, is crippling in many ways often taken for granted.  The testimony of Allen B. Fleming, Ph.D., the psychologist engaged to examine the debtor, indicates that the lengthy struggle with State Farm affected and depressed him in a number of ways.

As the months dragged on, the license suspension was undoubtedly frustrating and emotionally draining on the debtor and his family, especially since he made attempts to settle the matter with State Farm only to be unceremoniously rebuffed.  Some courts question whether damages for emotional distress can be awarded in the context of a discharge violation.  See Bock, 297 B.R. at 29.  However, other courts have found that a discharge violation can result in such damages.  See In re Feldmeier, 335 B.R. 807 (Bankr. D. Or. 2005); United States v. Rivera Torres (In re Rivera Torres), 309 B.R. 643 (B.A.P. 1ˢᵗ Cir. 2004); Poole v. U.B. Vehicle Leasing, Inc. (In re Poole), 242 B.R. 104 (Bankr. N.D. Ga. 1999).  In Feldmeier, the court noted that the legislative history of the discharge injunction recognizes "that the injunction is intended to protect more than financial interests." 335 B.R. at 813.  Indeed, § 524 is intended to prohibit not just legal action but telephone calls, letters, and all personal contacts; as such, "the contempt remedy, which provides for an award of 'compensatory damages,' should include compensation for emotional distress suffered by a debtor as a result of a creditor's willful violation of the discharge injunction." Id. at 814.

State Farm argues that since it was not aware of Shenkman's dealings with the debtor after the license suspension, the extended delay in reinstating the license should not be considered as a component of the damage calculation.  However, the complaint in this adversary proceeding was served directly on State Farm on June 27, 2005, just a little over a month after the debtor initially contacted Shenkman about the suspension.  Notwithstanding this fact, the debtor's license was not reinstated until the end of September.  State Farm had notice of the issue and again chose to ignore it; the company left Shenkman on his own, and only belatedly appeared after a default was entered for failure to file an answer.  State Farm's culpability for the debtor's situation is clear.

In order to give full effect to the bankruptcy discharge, creditors who willfully violate the injunction must face the consequences of their actions.  Like many

creditors, State Farm has sought to minimize the effect of its behavior throughout this case, including its negligent and cavalier attitude once it received actual notice of the bankruptcy and its failure to timely answer the adversary complaint even when directly served.  It seeks to place the blame for its conduct upon the debtor, or upon the attorney it hired to prosecute its subrogation claims.  Ultimately, however, had State Farm exercised even minimal effort after learning of the debtor's bankruptcy, there would have been no violation of the debtor's discharge.  Accordingly, based upon the record, the Court concludes that it is appropriate to issue an award of actual damages for lost wages, emotional distress, and the attendant discomfort and costs associated with the loss of his driver's license, all of which were the direct result of State Farm's willful violation of the discharge injunction in this case.  The Court also finds it appropriate to issue an award of reasonable attorney's fees associated with the prosecution of this adversary proceeding.  Pursuant to the Court's authority under 11 U.S.C. § 105(a), the debtor is hereby awarded $1,100.00 in lost wages, $6,250.00 for emotional distress, $50,250.00 in attorney's fees, and $9,029.66 in costs, for a total of $66,629.66.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.